1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

Wardia Vasquez,

               Plaintiff,

    v.

O'Reilly Auto Enterprises, LLC, et al.,

               Defendants.

Case No. 1:21-CV-01099-KJM-CKD

ORDER

In this employment action, plaintiff Wardia Vasquez claims defendant O'Reilly Auto Enterprises, LLC violated several California employment laws. Defendant moves for summary judgment as to all claims, or alternatively, partial summary judgment. The court **grants the motion in part**.

## I.   EVIDENTIARY OBJECTIONS

Defendant objects to plaintiff's exhibits 23 and 24 as hearsay, lacking foundation and authentication, relevance/probative value, and as improper expert opinion, and it also objects to a statement plaintiff made in her deposition as hearsay. *See generally* Evid. Objs., ECF No. 36-2. The court has reviewed the contested evidentiary submissions and has determined each could be reduced to an admissible form at trial and therefore **overrules** defendant's objections. *See JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016) ("[A] district court may consider hearsay evidence submitted in an inadmissible form, so long as the underlying

1

1  evidence could be provided in an admissible form at trial, such as by live testimony."); *Fraser v.*

2  *Goodale*, 342 F.3d 1032, 1037 (9th Cir. 2003).

3  **II.   BACKGROUND**

4       Defendant O'Reilly Auto Enterprises, LLC employed plaintiff Wardia Vasquez from

5  August 1994 until April 2020, when O'Reilly included her in a "reduction in force" (RIF) layoff.

6  Miramontez Decl. ¶ 4, ECF No. 27-8 (clarifying "O'Reilly and its related entities" hired

7  plaintiff); Barron Decl. ¶ 18, ECF No. 27-4.  Plaintiff worked as an assistant store manager

8  (ASM) from approximately 1999 until the date of her termination.  Miramontez Decl. ¶ 4.  The

9  following facts are undisputed unless otherwise noted.

10      **A.   District Manager Email and Conversation**

11       In June 2019, defendant's district manager Marc Miramontez emailed the store manager

12  regarding a recent store visit recapping his notes from conversations with the team members.

13  Miramontez Email, Miramontez Decl. Ex. F, ECF No. 27-12; Miramontez Decl. ¶ 7.  In this

14  email, Miramontez expressed the following notes about plaintiff:

15          She seems VERY complacent.  I see she has been with us for a long
16          time, but I feel she is tired.  I don't sense much passion for the job.  I
17          would do some digging here.  Maybe she needs some motivation?
18          Influence?  I'll have to talk with her more when I return.

19  Miramontez Email (capitalization in original).  In the same email, Miramontez described another

20  employee as an "[o]ld school guy just happy where he is.  He isn't gonna set the world on fire,

21  but he isn't going to disappoint either.  Steady."  *Id.*

22       Then in March 2020, Miramontez spoke with plaintiff about changing her position from

23  ASM to an installer service specialist (ISS).  Miramontez Decl. ¶ 7; Vasquez Dep. 31:8–32:25,

24  36:1–43:24, Paradis Decl. Ex. A, ECF No. ECF No. 27-6; Levy Decl. Ex. 1, ECF No. 30-4.[1]  The

25  ASM handled retail sales inside the store and the ISS handled commercial sales, but both are at

26  the same management level, just below the store manager.  Vasquez Dep. 36:15–37:3, 162:23–

---

[1] Both parties provide excerpts of plaintiff's deposition.  The court cites to deposition transcript page numbers appearing in the bottom right corner of each page.

1  163:7; Miramontez Dep. 38:18–39:4, Paradis Decl. Ex. E, ECF No. 27-7; Levy Decl. Ex. 2, ECF

2  No. 30-5.[2]

3       First, the parties dispute whether the change in title and position would be considered a

4  demotion.  *Compare* Vasquez Dep. 31:15–20, *with* Miramontez Dep. 110:22–111:2.  Plaintiff

5  acknowledges an ISS generally has larger incentive plans than an ASM but noted because the

6  store already had an ISS she would be "an ISS back up" and compete for sales with the existing

7  ISS.  Vasquez Dep. 31:19–20, 32:25, 38:2–39:14.  On the other hand, Miramontez disputes ever

8  telling plaintiff the ISS role would be a back-up role and testified the role would have been a

9  "tandem role."  Miramontez Dep. 110:22–25.  According to Miramontez, plaintiff "would have

10  been there to help out" and [t]he volume they were seeing required [them] to add another job

11  there."  *Id.* 110:24–111:2.

12       Second, the parties dispute why Miramontez wanted to change plaintiff's position.

13  Plaintiff testified Miramontez mentioned wanting to promote to the ASM position a "young girl,"

14  who had just started with the company and had expressed an interest in a promotion and in

15  managing her own store.  Vasquez Dep. 42:10–21.  Miramontez, however, testified he was not

16  aware of any such "young women."  Miramontez Dep. 111:21–25.  Rather, Miramontez testified

17  he wanted to move plaintiff to an ISS position because she was not "fulfilling the scheduling

18  requirements for an [ASM]" and had expressed interest in the ISS role by helping out on the

19  commercial side on prior occasions.  *Id.* 39:5–13; Miramontez Decl. ¶ 7.  Miramontez also

20  claimed he wanted to move plaintiff to the new position to try and "reinvigorate" and "motivate"

21  her.  Miramontez Decl. ¶ 7.  However, a few days later, Miramontez informed plaintiff he was not

22  going to move her to an ISS position.  Vasquez Dep. 32:12–14; 45:9–56:20.

23       **B.     RIF Grading Metrics and Layoffs**

24       On April 8, 2020, approximately two weeks after Miramontez spoke to plaintiff regarding

25  the ISS position, defendant laid off plaintiff as part of a company-wide reduction in force (RIF).

---

[2] Both parties provide excerpts of Miramontez's deposition.  The court cites to deposition transcript pages listed at the bottom right corner.

Barron Decl. ¶ 18; *see* Vasquez Dep. 46:19–20.  Defendant claims it was prompted to reduce its workforce in April 2020 in response to the "uncertainty and the economic effects of the COVID-19 pandemic." *Id.* ¶ 4.  To decide which team members across the whole company would be subject to the RIF, defendant applied a grading matrix with five categories: "(1) Team Member Productivity Rating; (2) Evaluation of Performance; (3) Progressive Discipline/Attendance; (4) Tenure/Seniority; and (5) Culture Rating." *Id.* (excepting delivery specialists selected by seniority through "last-in-first-out" system).  Defendant then selected the team member with the lowest rating in plaintiff's store to be laid off.  *Id.*

Defendant calculated the first category—productivity rating—"by the team member's 12-month payroll percentage." *Id.* ¶ 5.  It calculated payroll percentage "by dividing the team member's wages by the team member's average sales over a 12-month period." *Id.*  Payroll percentages were divided into three tiers with a corresponding productivity rating score. *Id.* ¶¶ 5–6 (detailing how tier one rating for payroll percentage below 13.2% was assigned rating score of five, tier two rating for payroll percentage ranging from 13.2–16.6% was assigned rating score of three, and tier three rating for any payroll percentage above 16.6% was assigned rating score of one). *Id.* ¶ 6.  Defendant gave the most weight of any category to the productivity rating by multiplying the payroll productivity score by five. *Id.*  Plaintiff received a weighted score of five for productivity rating, the lowest possible score, while "every other team member in [her] store scored either a 15 or 25[.]" *Id.* ¶ 7.  Plaintiff received the highest possible score for the second, third and fourth categories—evaluation of performance, progressive discipline/attendance, and tenure/seniority. *Id.* ¶¶ 8–13.  Her performance evaluations were completed by the store manager, who was in a romantic relationship with plaintiff starting in 2021.  *See* Performance Evaluations, Levy Decl. Exs. 5–10. ECF Nos. 30-7–30-13; Vasquez Dep. 18:22–19:5.

Defendant purportedly based the fifth category—culture rating—on factors including "trust, honesty, dedication to work, hard work, win-win attitude, and sales performance."  Barron Decl. ¶¶ 14–16.  In early April 2020, defendant informed regional directors about the potential RIF.  *Id.* ¶ 16.  At that time, the regional director called the district manager in plaintiff's district, Miramontez, and asked him during that call to "give a culture rating for . . . team members in his

district without explaining why this information was being gathered or its intended purpose." *Id.*; Miramontez Dep. 24:12–25:9 (explaining regional director read off list of names and Miramontez gave score for each of one hundred to one hundred-twenty employees on the spot using a "culture card" as a reference). Miramontez testified he did not know the scores would be used for a RIF and did not consider team members' ages when giving scores. Miramontez Dep. 83:5–18, 86:1–16. Miramontez gave plaintiff the lowest possible culture rating score. Barron Decl. ¶ 16. Miramontez testified he gave her a score of one because she had "unsatisfactory behavior and unsatisfactory [sales] results." Miramontez Dep. 26:12–19. Miramontez scored her for unacceptable behavior claiming plaintiff was not a team player and was not selfless—for example, she did not come in to cover when team members called in sick and had a rigid schedule that did not accommodate closing shifts. *Id.* 26:20–30:24. Plaintiff disputes this characterization and claims she worked the schedule set by the store manager including Sundays when needed. Vasquez Dep. 134:1–14. After assessing all team members in the company, except delivery specialists, with the same five-category grading matrix, defendant laid off plaintiff for having the lowest point total in her store. Barron Decl. ¶ 18. The next lowest rating in plaintiff's store scored three points higher. Pl.'s Ex. 11 at 2, ECF No. 34-1. Although this individual also received the lowest possible culture rating, received the same tenure/seniority score, and had a lower progressive discipline/attendance score and evaluation performance score than plaintiff, the individual received a higher productivity rating, which resulted in a higher overall score. *Id.*

### C.    Meal and Rest Breaks

While plaintiff was employed by O'Reilly, defendant had policies in place to ensure employees take rest and meal breaks in accordance with state law. Miramontez Decl. ¶ 8; Team Member Handbook, Miramontez Decl. Ex. C, ECF No. 27-10; Policy Manual, Miramontez Decl. Ex. D, ECF No. 27-11. Employees are generally scheduled for an unpaid meal break of 30 to 60 minutes for each eight-hour shift. Team Member Handbook at 8.[3] O'Reilly's policies prohibit employees from working during their meal and rest breaks. *See id.* at 8; Policy Manual at 5–6.

---

[3] When citing page numbers on filings, the court uses the pagination automatically generated by the CM/ECF system.

1    "Any time worked while not on the clock must be immediately reported to the
2    supervisor/manager for time record correction."  Team Member Handbook at 8; *see also* Policy
3    Manual at 5.  Employees should not be interrupted during their lunch breaks.  Team Member
4    Handbook at 8; Policy Manual at 8.  However, if an employee is interrupted, the employee must
5    be compensated for the interrupted break.  Team Member Handbook at 9; Policy Manual at 5.  If
6    an interruption occurs before an employee receives at least 30 minutes of an uninterrupted meal
7    break, the meal break is considered time worked.  Team Member Handbook at 9.  However, if the
8    employee is scheduled for a one-hour meal break and returns to work after having had at least 30
9    minutes of an uninterrupted meal break, the employee must be paid for 30 minutes of work time
10   while the remaining 30 minutes are unpaid.  *Id.*  Rest breaks under 20 minutes must be paid.
11   Policy Manual at 6.  Additionally, supervisors and managers should try to schedule a 10-minute
12   rest break for every four hours worked, unless otherwise required by law.  *Id.* at 8.  Similar to
13   meal breaks, employees should not be performing any duties while on break.  *Id.*

14          Plaintiff reviewed a copy of defendant's policy manual when she first started working for
15   defendant, Vasquez Dep. 185:20–23, and received a copy of O'Reilly's Team Member Handbook
16   in 2019, which outlines O'Reilly's policies regarding meal and rest breaks, Acknowledgment,
17   Miramontez Decl. Ex. B.  As part of her position as an ASM, plaintiff trained new hires regarding
18   the company's time keeping system and policies.  Vasquez Dep. 185:5–12.  Plaintiff was aware
19   of the written policy prohibiting employees from working "off the clock."  *Id.* 185:9–15.

20          In the last ten years of her employment, plaintiff prepared the schedules for employees in
21   her store, including herself, and ensured everyone received lunch breaks as required.  *Id.* 135:22–
22   137:11; 206:13–17.  The software used to create the schedules automatically provides for lunch
23   times and ensures there is proper coverage in the store while some employees are on break.  *Id.*
24   136:19–137:17, 207:12–208:10.  An employee who takes a late lunch break automatically
25   receives a meal break penalty.  *Id.* 167:15–168:5.  Additionally, an employee cannot take a
26   shorter lunch without a manager's authorization, and if a manager provides authorization, a meal
27   break penalty automatically populates.  *Id.* 168:6–15; *see also* Policy Manual at 6.  If an

1    employee does not receive managerial authorization, the time will still be paid, but the employer

2    will then be subjected to progressive discipline.  Policy Manual at 6.

3         Plaintiff generally took an hour break for lunch.  Vasquez Dep. 202:4–6.  However, she

4    estimates she was interrupted an average of at least three times out of five days a week during her

5    lunch break.  *Id.* 202:7–9.  These interruptions often took the form of questions from other

6    employees and lasted around two minutes to sometimes over ten minutes.  *Id.* 202:12–203:1.  In

7    one instance, the interruption lasted 45 minutes.  *Id.* 204:1–8.  Plaintiff informed her manager of

8    these interruptions.  *Id.* 179:4–14.  Interruptions also came in the form of phone calls.  *Id.* 175:2–

9    7.  Plaintiff testified despite the company's written policy, her former district manager told her to

10   answer calls even when she was on her lunch break.  *Id.* 175:2–24.  She discussed the issue with

11   her immediate supervisor, the store manager, who told her to ignore the calls.  *Id.* 177:6–11.

12   Despite this direction, she answered the phone because it was for the company and it was her job.

13   *Id.* 177:12–18.  Plaintiff testified she did not clock in when those interruptions occurred, because

14   she was on her lunch break and wanted to take that break.  *Id.* 173:9–174:19.  In her deposition,

15   plaintiff acknowledges she could have directed the employees asking questions to the supervisor

16   on duty because she was on her lunch break or she could have ignored their questions.  *Id.*

17   180:12–181:4.  While she was on her lunch breaks, there was another manager or supervisor who

18   was on the clock.  *Id.* 174:5–8.  Generally, her immediate supervisor, the store manager, told her

19   not to work during her lunch break.  *Id.* 181:25–183:3.

20        In addition, plaintiff testified she did not take a rest break every day because she was

21   "[t]oo busy," there was "so much stuff to do," and she did not "have time to take a break."  *Id.*

22   212:11–17, 227:2–16.  She acknowledged there were other supervisors she personally scheduled

23   to be on the clock to ensure she would have the opportunity to take rest breaks.  *Id.* 212:18–21.

24   However, she testified "there's a lot of times there's just two people on the clock" and "[i]f you

25   get busy, you're busy.  You're kind of stuck.  You can't take breaks."  *Id.* 212:21–24.  No one

26   told her she could not take her rest break.  *Id.* 227:6–16.  Although she did not get her rest breaks,

27   she made sure all her subordinate team members either received or had the opportunity to take

28   their meal and rest breaks.  *Id.* 254:20–255:8.

At the end of every pay period, employees, including plaintiff, were instructed to review their timecards and report any errors. *Id.* 199:17–21. Plaintiff reviewed her timecard daily to ensure everything was correct and reported any errors. *Id.* 170:22–171:4; 199:22–24. She also signed her timecards at the end of the pay period, knowing she had reviewed them daily. *Id.* 171:1–10. For example, after one incident where her lunch break was interrupted for over 45 minutes, she informed her manager and her manager added the 45 minutes to her timesheet as time worked. *Id.* 204:17–21. She also certified she had received all her meal and rest breaks. *Id.* 217:25–221:11. In the last four years of her employment, defendant paid plaintiff "219 meal break penalties for either late or missed meal periods." Miramontez Decl. ¶ 9.

### D.   Procedural History

Plaintiff brought this action against O'Reilly in Stanislaus County Superior Court making five state law claims: (1) age discrimination in violation of California's Fair Employment and Housing Act (FEHA), California Government Code Section 12900, *et seq.*; (2) age harassment in violation of the FEHA; (3) failure to provide meal and rest breaks in violation of California Code of Regulations, Title 8, Section 11040; (4) failure to maintain records as required by the Industrial Welfare Commission Work Orders 4-2000, 4-2001 and California Labor Code Section 226.7; and (5) violation of California Business and Professions Code Section 17200, *et seq.* Compl. ¶¶ 16–56, ECF No. 1-1. Plaintiff seeks general, specific and punitive damages. *Id.* at 10. O'Reilly removed the action based on diversity jurisdiction. Notice of Removal, ECF No. 1. O'Reilly now moves for summary judgement as to all of plaintiff's claims. Mot. Summ. J., ECF No. 27; Mem., ECF No. 27–1. Plaintiff opposes the motion. Opp'n, ECF No. 30. The motion is fully briefed. *See* Reply, ECF No. 36. Although the case was filed in this district's Fresno courthouse, the case was reassigned to the undersigned on September 13, 2023. Order, ECF No. 41.

## III.   LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome

of the suit under the governing law." *Id.*  The parties must cite "particular parts of materials in

the record." Fed. R. Civ. P. 56(c)(1).  The court then views the record in the light most favorable

to the nonmoving party and draws reasonable inferences in that party's favor.  *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

## IV.   DISCUSSION

### A.      Age Discrimination (Claim One)

Plaintiff brings her first claim under California's Fair Employment and Housing Act

(FEHA), *see* Compl. ¶¶ 16–24, which "prohibits employers from discharging or dismissing

employees over the age of forty based on their age." *Merrick v. Hilton Worldwide, Inc.*, 867 F.3d

1139, 1145 (9th Cir. 2017) (citing Cal. Gov't. Code §§ 12926(b), 12940(a)).

Because of the similarity between federal and state discrimination laws, California has

adopted the three-stage burden-shifting test established by the U.S. Supreme Court in *McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792 (1973), for adjudicating discrimination claims based on

circumstantial evidence.  *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 354 (2000).  "This so-called

*McDonnell Douglas* test reflects the principle that direct evidence of intentional discrimination is

rare, and that such claims must usually be proved circumstantially." *Id.* at 354.  Under this

framework, the employee has the initial burden of establishing a prima facie case of

discrimination, which raises a presumption of discrimination.  *Id.* at 354–55.  The burden then

shifts to the employer to rebut the presumption by presenting "a legitimate, non-discriminatory

reason" for the adverse employment decision.  *Id.* at 355–56.  "If the employer sustains its

burden, the presumption established in the first step disappears, and the plaintiff must raise a

triable issue suggesting that the employer's proffered reason is mere pretext for unlawful

discrimination, or offer other evidence of discriminatory motive." *Merrick*, 867 F.3d at 1146

(citing *Guz*, 24 Cal. 4th at 355–56).

### 1.      Prima Facie Case of Discrimination

As noted, plaintiff bears the initial burden of establishing a prima facie case of

discrimination.  *Guz*, 24 Cal. 4th at 354.  "This step is designed to eliminate at the outset the most

patently meritless claims, as where the plaintiff is not a member of the protected class or was

1 | clearly unqualified, or where the job [s]he sought was withdrawn and never filled." *Id.* (citations

2 | omitted).  Although plaintiff's burden is "not onerous," plaintiff must provide evidence that

3 | "give[s] rise to an inference of unlawful discrimination." *Texas Dep't of Cmty. Affs. v. Burdine*,

4 | 450 U.S. 248, 253 (1981).  "The requisite degree of proof necessary to establish a *prima facie*

5 | case . . . on summary judgment is minimal and does not even need to rise to the level of a

6 | preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994).

7 | "The amount of evidence that must be produced in order to create a prima facie case is very

8 | little." *Id.* (citations, alterations, emphasis and quotation marks omitted).

9 |      In general, to establish a prima facie case of age discrimination, plaintiff must show she

10 | was "(1) a member of a protected class, (2) [] qualified for the position [s]he sought or was

11 | performing competently in the position [s]he held, (3) [] suffered an adverse employment action,

12 | such as termination, demotion, or denial of an available job, and (4) some other circumstance

13 | suggests discriminatory motive." *Guz*, 24 Cal. 4th at 355.

14 |      Defendant does not dispute plaintiff has established the first and third elements—plaintiff

15 | was fifty-six years old in 2020 and faced an adverse employment action. Pl.'s Ex. 23, ECF 34-8;

16 | Def.'s Suppl. Resp. to Form Interrogs., Levy Decl. Ex. 17 at 5, ECF No. 30-14; *see* Mem. at 20.

17 | Defendant, however, argues plaintiff has not established elements two and four. *See* Mem. at 20;

18 | Reply at 3.  In her opposition, plaintiff does not mention the *McDonnell Douglas* test or the

19 | elements of the prima facie case of discrimination. *See generally* Opp'n.  Nevertheless, the court

20 | considers the evidence plaintiff relies on to determine whether plaintiff has met her burden of

21 | establishing a prima facie case of discrimination as to the two disputed elements. *See Coleman v.*

22 | *Quaker Oats Co.*, 232 F.3d 1271, 1282 (9th Cir. 2000) (plaintiff may rely on same evidence to

23 | establish both prima face case and pretext).

24 |      Here, plaintiff has produced the minimal evidence required on summary judgment. *See*

25 | *Wallis*, 26 F.3d at 889.  First, plaintiff has shown there is a triable issue of fact regarding whether

26 | she was performing her job satisfactorily: although plaintiff had below average sales and a low

27 | payroll percentage, the record shows she received an overall rating of "exceeds requirements" on

28 | her last performance evaluation, Barron Decl. ¶ 9, and did not receive any progressive

1    disciplinary actions in the twelve months preceding the RIF evaluations, *id.* ¶ 10; *see also, e.g.*,

2    *Douglas v. Anderson*, 656 F.2d 528, 533 n.5 (9th Cir. 1981) ("[Plaintiff] need only produce

3    substantial evidence of satisfactory job performance sufficient to create a jury question on this

4    issue."); *Ramsey v. Siskiyou Hosp., Inc.*, No. 14-01908, 2016 WL 3197557, at *8 (E.D. Cal. June

5    9, 2016) (finding positive performance reviews raised triable fact when evidence of poor job

6    performance was ambiguous).

7            Second, plaintiff has produced some evidence suggesting an inference of age

8    discrimination.  The fourth element of the prima facie case can be established if plaintiff can

9    show she was "replaced by [a] substantially younger employee[] with equal or inferior

10   qualifications or discharged under circumstances otherwise giving rise to an inference of

11   discrimination."  *Merrick*, 867 F.3d at 1146 (citations and internal marks omitted).  In reduction

12   of workforce cases, a plaintiff can meet the fourth element "through circumstantial, statistical or

13   direct evidence that the discharge occurred under circumstances giving rise to an inference of age

14   discrimination."  *Wallis*, 26 F.3d at 891 (quoting *Rose v. Wells Fargo & Co.*, 902 F.2d 1417,

15   1421 (9th Cir. 1990)).  "Such an inference can be established by showing the employer had a

16   'continuing need for his skills and services in that his various duties were still being performed.'"

17   *Id.* (quoting *Rose*, 902 F.2d at 1421).  Here, plaintiff testified she heard her replacement was in

18   his twenties.  Vasquez Dep. 80:4–17.  And in the months after her termination, twenty-two

19   different individuals "performed some of the duties previously performed" by plaintiff, half of

20   whom were under the age of 40, Def.'s Resp. to Special Interrogs. at 14, Levy Decl. Ex. 21, ECF

21   No. 34-7.  This suggests defendant had a continuing need for the services and skills plaintiff had

22   been providing, establishing an inference of discrimination.  Plaintiff also points to Miramontez's

23   email from June 2019 indicating her complacency; her conversation with Miramontez where he

24   suggested moving her to an ISS position to "help out," which she considered a demotion; the low

25   culture score from Miramontez on the RIF grading matrix and statistics showing older ASMs

26   received lower culture scores generally and were subject to the RIF when younger ASMs were

27   not.  Opp'n at 7–13; Miramontez Email; Miramontez Decl. ¶ 7; Vasquez Dep. 31:3–32:14; Pl.'s

28   Ex. 23 at 2; Def's Resp. to Special Interrogs. at 14.

For purposes of summary judgment, the court finds plaintiff has met her minimal burden of establishing a prima facie case of discrimination.

### 2.       Legitimate Nondiscriminatory Reason

Once plaintiff meets her burden of establishing a prima facie case of discrimination, the burden shifts to defendant to rebut the presumption of discrimination by presenting a legitimate, non-discriminatory reason for the termination.  Defendant has done so here.  It has shown a RIF was necessary companywide due to the economic uncertainty surrounding the COVID-19 pandemic in March 2020.  Barron Decl. ¶ 4.  Plaintiff was selected for the RIF because her score on the grading matrix, which was applied to all employees, was the lowest in her store.  *Id.* ¶ 18.

### 3.       Pretext

Because defendant has met its burden of rebutting the presumption of discrimination, the burden shifts back to plaintiff to raise a genuine issue of fact as to whether defendant's articulated reasons are pretextual.  *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cir. 1996).

"[A] plaintiff can prove pretext in two ways: (1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer."  *Chuang v. Univ. of Calif. Davis, Bd. of Trustees*, 225 F.3d 1115, 1127 (9th Cir. 2000).  In other words, plaintiff "must produce sufficient evidence to allow a jury to conclude that age was a 'substantial motivating factor' in [her] termination."  *Merrick*, 867 F.3d at 1147 (citing *Harris v. City of Santa Monica*, 56 Cal. 4th 203, 232 (2013)).  To show pretext, "very little" direct evidence is needed, but if circumstantial evidence is offered, the plaintiff must produce "substantial" and "specific" evidence of pretext.  *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998).  "The evidence as to pretext . . . must be considered cumulatively."  *Bowen v. M. Caratan, Inc.*, 142 F. Supp. 3d 1007, 1026 (E.D. Cal. 2015) (citing *Chuang*, 225 F.3d at 1129).

Plaintiff incorrectly characterizes her burden as only needing "to present a factual predicate from which the inference [of unlawful discrimination] may be drawn."  Opp'n at 8.  Although that may be sufficient to establish a prima facie case for discrimination, at this stage,

12

1    plaintiff must produce either direct evidence of discrimination or "specific" and "substantial"

2    evidence of pretext.  *See Wallis*, 26 F.3d at 890–91 (explaining plaintiff must provide evidence of

3    pretext and "the mere fact that a bare *prima facie* case had been made out was not in itself

4    sufficient").

5          As noted, plaintiff does not mention the *McDonnell Douglas* test in her opposition, but the

6    court considers the same evidence of record reviewed above.  Plaintiff has not provided direct

7    evidence of discrimination.  Rather, plaintiff relies on circumstantial evidence.  She argues her

8    low "culture rating" was the but-for cause of her termination, and the rating itself was motivated

9    in substantial part by "age-related bias."  Opp'n at 8.  She relies on the same evidence the court

10   considered in evaluating whether she established a prima facie case: statistical evidence

11   suggesting a pattern of discrimination; inconsistent reasoning behind the culture scores; the

12   attempted prior de facto demotion; Miramontez's history of ageist statements; and her duties

13   being assigned to younger employees after her termination.  *See* Opp'n at 8–14.  Having

14   considered the evidence cumulatively, the court finds there is a triable issue of fact as to whether

15   defendant's stated reasons for discharging plaintiff was pretextual.

16                         a)    Statistical Evidence

17         Plaintiff argues the culture scores Miramontez issued show a pattern of discrimination.

18   Opp'n at 9–10.  "[T]o raise a triable issue on pretext, the statistics 'must show a stark pattern of

19   discrimination unexplainable on grounds other than age.'"  *Coleman*, 232 F.3d at 1283.  Plaintiff

20   compiled statistics of all ASMs in her district, a total of ten employees, and highlighted data

21   showing only the three ASMs who were over the age of forty received culture scores of one and

22   all were laid off in the RIF.  Pl.'s Ex. 23 at 2.  Defendant argues this sample size is statistically

23   insignificant and does not account for the "reality of the factors that went into the RIF."  Reply at

24   5.  It also argues the court should consider the statistics for all employees in the district, which

25   show there is no pattern of discrimination.  *Id.*

26         Evidence defendant treated similarly situated employees outside of plaintiff's protected

27   class more favorably may be probative of pretext.  *Vasquez v. County of Los Angeles*, 349 F.3d

28   634, 641 (9th Cir. 2003).  Although "[e]mployees in supervisory positions are generally deemed

13

1    not to be similarly situated to lower level employees," *id.* at 641, here, all employees, with the

2    exception of delivery specialists, were subject to the same grading matrix, Barron Decl. ¶ 4.  The

3    team members with the lowest score in each store, regardless of whether they were managers or

4    not, were laid off.  *Id.*  Here, the similarly situated employees are other employees who were

5    evaluated under the same grading matrix.

6         When considering the sample size of all defendant's employees in plaintiff's district, the

7    statistics do not show a stark pattern of discrimination.  Approximately 70 percent of employees

8    over the age of forty received the highest culture score of five and approximately 70 percent of

9    employees under the age of forty also received a culture score of five.  *Id.* ¶ 17.  Additionally,

10   plaintiff's store included three other team members over the age of forty who received higher

11   scores than plaintiff and were not included in the RIF.  *Id.*

12        Even when considering plaintiff's sample size of just the ten ASMs, the sample size is too

13   small to have strong predictive value.  *See, e.g.*, *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d

14   1201, 1209 (9th Cir. 2008) (finding two data sets of sixteen workers in the laid-off group and

15   sixteen in the retained group "too small to form a reliable basis for analysis").  Moreover,

16   plaintiff's statistical data does not account for other factors considered in defendant's RIF

17   decision-making, such as "team member productivity."  *See Pottenger v. Potlatch Corp.*, 329

18   F.3d 740, 748 (9th Cir. 2003) (finding statistical analysis insufficient to raise triable issue of fact

19   regarding pretext where statistical analysis fails to take relevant variables into consideration

20   (collecting cases)).  Notably, the three employees over forty who were also terminated, including

21   plaintiff, also had a productivity score of one and as noted, this factor was the most heavily

22   weighted in the grading matrix.  *See* Pl.'s Ex. 23.  For example, in plaintiff's own store, the two

23   employees with the next lowest scores also had culture ratings of one, but had productivity ratings

24   of three.  Pl.'s Ex. 11 at 2.  Despite both employees scoring lower in one or more of the other RIF

25   categories, both employees scored higher than plaintiff because of the heavily weighted

26   productivity rating score.  *See id.*  Additionally, one ASM over the age of forty had been subject

27   to discipline, which indicates that individual would have had a lower score on the third RIF

28   category.  Pl.'s Ex. 23.

1    Although plaintiff's statistical evidence may not be sufficient to show a stark pattern of

2    discrimination, plaintiff's statistical evidence is probative of pretext.  Almost 40 percent of those

3    who were laid off in plaintiff's district were over the age of forty, specifically five out of thirteen.

4    Barron Decl. ¶ 17.  Moreover, even though all employees were subject to the same grading

5    matrix, the fact that every single ASM over the age of forty was laid off and received the lowest

6    possible culture rating is probative of pretext.

7                          b)        Reasoning Behind the Culture Scores

8            Plaintiff argues Miramontez did not have "legitimate reasons for giving her a bad culture

9    score," Opp'n at 8, and used inconsistent reasoning in assigning the culture scores, *id.* at 10.  As

10   noted, plaintiff gives her culture score on the RIF grading matrix the greatest weight arguing but-

11   for the biased low score she would have scored five points instead of one, placing her score

12   higher than the next lowest scoring team member.  *Id.* at 7–8; Pl.'s Ex. 11 at 2.  Plaintiff's total

13   points on the RIF grading matrix equaled twenty-six and the next lowest total was twenty-nine.

14   Pl.'s Ex. 11 at 2.  To surpass the next lowest scoring team member plaintiff needed a culture score

15   of five.  *See* Barron Decl. ¶ 15 (detailing culture scores were awarded in units of one, three and

16   five).

17           Defendant purportedly based the fifth category—culture rating—on factors including

18   "trust, honesty, dedication to work, hard work, win-win attitude, and sales performance."  Barron

19   Decl. ¶¶ 14–16.  An employee received a five on the culture score "if the team member exhibited

20   acceptable behaviors and produced acceptable sales results[.]"  *Id.* ¶ 15.  "If [] team member[s]

21   exhibited acceptable behaviors but were not producing acceptable sales results, they were placed

22   in box 3 and received a score of 3."  *Id.*  "If [] team member[s] produced acceptable sales results

23   but did not exhibit acceptable behavior, they were placed in box 2 and given a score of 1."  *Id.*

24   Miramontez testified he gave her a score of one because she had "unsatisfactory behavior and

25   unsatisfactory results."  Miramontez Dep. 26:12–19.  Miramontez scored her for unacceptable

26   behavior claiming plaintiff was not a team player and was not selfless.  For example, he said she

27   did not cover shifts when team members called in sick and had a rigid schedule that did not

28   accommodate closing shifts.  *Id.* 26:20–30:24.  Additionally, it is undisputed plaintiff's average

1   monthly sales were below the store average by the time she was included in the RIF.  Vasquez

2   Dep. 244:14–19; Barron Decl. ¶ 7.  O'Reilly argues that "based on 'her unacceptable sales

3   results'" the highest score she could have received is a three.  Reply at 3.  Thus, even if she

4   received a culture score of three, she would still have the lowest score in her store.  Pl.'s Ex. 11.

5           Plaintiff disputes Miramontez's characterization of her behavior and sales results.  First,

6   she points to her most recent performance evaluation from August 2019, before the April 2020

7   scoring by Miramontez, when she received a culture score of "exceeds requirements."  Pl.'s Ex.

8   10, ECF No. 30-13 at 4.  Contrary to Miramontez's characterization, the performance evaluation

9   marks plaintiff as exhibiting "acceptable behaviors and produc[ing] acceptable results."  *Id.*  Her

10  prior performance evaluations also show plaintiff exhibited "acceptable behaviors and produce[d]

11  acceptable results."  Pl.'s Exs. 4–9, ECF Nos. 30-7–30-12.  These performance evaluations were

12  completed by the store manager, who was plaintiff's immediate supervisor.  *See* Pl.'s Exs. 5–10;

13  Vasquez Dep. 17:20–25.  Although the store manager was in a romantic relationship with

14  plaintiff after she was included in the RIF, *see* Vasquez Dep. 18:22–19:5, there is no evidence the

15  store manager was in a relationship with plaintiff prior to the RIF and in any event, the weight of

16  the evidence is for a jury to evaluate.  *See Anderson*, 477 U.S. at 255 ("Credibility determinations,

17  the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury

18  functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a

19  directed verdict.").

20          Here, it is unclear why the regional director contacted Miramontez for the culture ratings

21  as opposed to relying on or considering the team member's culture rating as provided for in the

22  performance evaluations.  *See* Barron Decl. ¶ 16.  Although plaintiff's average monthly sales

23  were below the store average, defendant does not show what constituted an "acceptable sales

24  result."  For example, defendant does not define the term and does not provide evidence that

25  acceptable sales result meant sales above the store's average.  On the record before the court,

26  "acceptable sales result" does not appear to be coexistent with the Team Member Productivity

27  Rating; otherwise, the Culture Rating would be redundant.  Plaintiff has shown there is a genuine

28  dispute regarding whether she produced acceptable sales results.

Second, plaintiff also shows there is a genuine dispute with regards to whether she exhibited acceptable behaviors.  Contrary to Miramontez's characterization of plaintiff's behavior, plaintiff testified at deposition that she complied with scheduling requirements, worked weekends if required to and covered for team members who needed the day off.  Vasquez Dep. 134:1–135:19.  The parties dispute whether plaintiff exhibited unacceptable behavior.  Whether to believe Miramontez's or plaintiff's own characterization of plaintiff's behavior is for the jury to decide.  *See Anderson*, 477 U.S. at 255.  Here, if a jury were to find plaintiff was producing acceptable results and exhibited acceptable behaviors as noted in her performance review, then contrary to defendant's argument, the highest score plaintiff could have received was a five, not a three.  *See* Barron Decl. ¶ 15 ("If [] team member[s] exhibited acceptable behaviors and produced acceptable sales results, they were placed in box 4 and received a score of 5 [for the Culture Rating]").  Accordingly, plaintiff has raised a triable issue of fact as to whether defendant's reasons for discharging plaintiff by using the culture score was pretextual.

c)      Attempted Demotion and Ageist Comments

Plaintiff cites to Miramontez's email with alleged ageist comments and the purported "demotion" conversation.  Opp'n at 13; Miramontez Email.  The email was written nine months before the RIF and described plaintiff as "tired," lacking "passion for the job" and described another employee over age forty as an "[o]ld school guy just happy where he is."  Miramontez Email.  Plaintiff argues the email shows discrimination because the "characterizations . . . are ageist stereotypes."  Opp'n at 13.  The Ninth Circuit has found similar comments to be insufficient to establish pretext because they were "not tied directly to [plaintiff's] layoff[.]" *Nidds*, 113 F.3d at 918–19 (affirming summary judgment where employer stated "he intended to get rid of all the 'old timers'" deeming it "weak evidence not enough to create an inference of age discrimination"); *Nesbit v. Pepsico, Inc*., 994 F.2d 703, 705 (9th Cir. 1993) (holding statement by supervisor "[w]e don't necessarily like grey hair" was insufficient to create an inference of age discrimination because it was "not tied directly to [plaintiff's] termination").  In the same way, Miramontez's conversation about changing plaintiff's position to an ISS role alone does not

17

1  establish O'Reilly's RIF grading matrix score for plaintiff was pretextual.  Miramontez Decl. ¶ 7;

2  Vasquez Dep. 31:3–32:14.

3  However, the comments and the timing of the conversation between the plaintiff and

4  Miramontez could be probative of pretext.  As noted, the parties dispute whether the proposed

5  change in plaintiff's position to ISS would have been a demotion and whether Miramontez

6  initially wanted to change plaintiff's position in order to promote a younger employee.  After

7  discussing with plaintiff changing her position, Miramontez then decided not to follow through,

8  for reasons the record does not make clear.   Plaintiff was laid off shortly thereafter.  *See* Vasquez

9  Dep. 45:9–56:20.  Also at or about the same time Miramontez changed his mind about

10  reassigning plaintiff from an ASM to ISS, he provided the culture ratings over the phone that

11  were used to guide the RIF.  Viewing the evidence in the light most favorable to plaintiff, a

12  reasonable jury could find Miramontez was trying to demote plaintiff, but later changed his mind

13  only because he knew plaintiff could or would be terminated.  A jury could find defendant's

14  stated reason for terminating plaintiff was pretextual.

15  d)    Duties Assigned to Younger Employees

16  Finally, plaintiff offers evidence to show after she was laid off, her job duties were

17  assigned to twenty-two other employees, and "half of them (11) were under 40."  Opp'n at 13;

18  Levy Decl. Ex. 21 at 14.  Plaintiff also testified, vaguely, she heard "from customers and people

19  that work [at O'Reilly's]" the replacement ASM was in his twenties.  Vasquez Dep. 80:4–17.

20  Plaintiff's position was not filled for nine months after the RIF.  Levy Decl. Ex. 21 at 14;

21  Miramontez Decl. ¶ 10.  Evidence that a substantially younger employee replaced plaintiff can be

22  an indicator of age discrimination.  *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308,

23  313 (1996); *Mayes v. WinCo Holdings, Inc.*, 846 F.3d 1274, 1282 (9th Cir. 2017).  Here, it is

24  unclear whether plaintiff was in fact replaced with a younger person.  Neither party provides

25  information regarding plaintiff's replacement.  However, plaintiff has shown her duties were

26  assigned to younger employees.  This evidence can be probative of pretext.

27  Although each individual evidence alone may be insufficient to defeat summary

28  judgment, having considered all the evidence cumulatively, the court cannot find no reasonable

1    juror could find defendant's stated reason for discharging plaintiff was pretextual.  Accordingly,

2    the court **denies** summary judgment as to this claim.

3              **B.      Age Harrassment (Claim Two)**

4              Plaintiff also brings an age harassment claim against defendant under the FEHA.  Compl.

5    ¶¶ 25–34.  "To establish a claim for harassment, a plaintiff must demonstrate that: (1) she is a

6    member of a protected group; (2) she was subjected to harassment because she belonged to this

7    group; and (3) the alleged harassment was so severe that it created a hostile work environment."

8    *Lawler v. Montblanc N. Am., LLC*, 704 F.3d 1235, 1244 (9th Cir. 2013) (citing *Aguilar v. Avis*

9    *Rent A Car Sys., Inc.*, 21 Cal.4th 121 (1999)).

10             The FEHA is not a general civility code.  *Lyle v. Warner Bros. Television Prods.*, 38 Cal.

11   4th 264, 295 (2006) (citations omitted).  "Simple teasing, offhand comments, and isolated

12   incidents (unless extremely serious) will not amount to discriminatory changes in the terms or

13   conditions of employment."  *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal

14   marks and citations omitted).  Rather, "actionable harassment must be sufficiently severe or

15   pervasive to alter the conditions of the victim's employment and create an abusive working

16   environment."  *Bailey v. San Francisco Dist. Attorney's Off.*, 552 P.3d 433, 445 (2024)

17   (emphasis, marks and citation omitted).

18             Plaintiff argues Miramontez's email and conversation with plaintiff regarding her

19   purported demotion constitutes unlawful age harassment.  *See* Compl. ¶¶ 28–33; Opp'n at 14–15.

20   As noted, Miramontez had emailed the store manager noting plaintiff seemed "VERY

21   complacent," tired and seemed to lack "passion for the job."  Miramontez Email (emphasis in

22   original).  In the same email, Miramontez described another employee as an "[o]ld school guy

23   just happy where he is."  *Id.*  Miramontez then spoke with plaintiff before the RIF about changing

24   her position from ASM to an ISS.  Miramontez Decl. ¶ 7; Vasquez Dep. 31:8–32:25; 36:1–43:24.

25   As noted above, the parties dispute whether he wanted to change plaintiff's position to promote a

26   younger employee.  *Compare* Vasquez Dep. 42:10–21, *with* Miramontez Dep. 39:5–13, 111:21–

27   25.

1    Defendant argues the one-time conversation with Miramontez does not rise to the level of

2    creating a hostile working environment.  Mot. at 22.  Plaintiff argues a single incident may be

3    sufficient to state a claim for a hostile environment.  Opp'n at 15 (citing *Dee v. Vintage*

4    *Petroleum Inc.*, 106 Cal. App. 4th 30 (2003)).  However, in *Dee*, the court found a reasonable

5    trier of fact could infer the single use of an ethnic remark was not an isolated event in light of the

6    employer's constant use of other derogatory remarks and conduct.  106 Cal. App. 4th at 36–37.

7    In a sexual harassment case, one California court found cases have shown a "single incident must

8    be severe in the extreme and generally must include either physical violence or the threat

9    thereof."  *Herberg v. Cal. Inst. of the Arts*, 101 Cal. App. 4th 142, 151 (2002).  Here, construing

10    the evidence in favor of plaintiff, the court finds no reasonable juror could find one email that

11    may have some reference to age and a one-time conversation about potentially demoting plaintiff

12    in favor of a younger person was sufficiently severe or pervasive to create a hostile work

13    environment.  *Cf., e.g.*, *Hughes v. Pair*, 46 Cal. 4th 1035, 1048 (2009) (no sexual harassment

14    when alleged harassment consisted of comments made during single telephone conversation and

15    brief statement made to plaintiff later that day); *Westendorf v. W. Coast Contractors of Nev., Inc.*,

16    712 F.3d 417, 422 (9th Cir. 2013) (four offensive remarks not sufficient to show sexual

17    harassment was sufficiently severe or pervasive).

18    The court **grants** summary judgment as to this claim.

19    **C.    Meal and Rest Breaks (Claim Three)**

20    Plaintiff argues defendant failed to provide meal and rest breaks in violation of California

21    labor laws.  Compl. ¶¶ 35–47.  "California requires non-exempt employees be afforded rest

22    breaks and meal periods after working a certain number of hours."  *Rodriguez v. Taco Bell Corp.*,

23    896 F.3d 952, 956 (9th Cir. 2018) (citing Cal. Labor Code §§ 226.7, 512).  Under the relevant

24    code and regulations, employers must provide 30-minute meal breaks for employees who work

25    more than five hours in a workday.  *See* Cal. Lab. Code § 512(a); Cal. Code Regs. tit. 8,

26    § 11040(11).  Additionally, employers must provide ten-minute rest periods for every four hours

27    worked.  Cal. Code Regs. tit. 8, § 11040(12).  An employer satisfies its obligation to provide meal

28    and rest breaks "if it relieves its employees of all duty, relinquishes control over their activities

1    and permits them a reasonable opportunity to take an uninterrupted 30-minute break, and does not

2    impede or discourage them from doing so." *Brinker Rest. Corp. v. Super. Ct.*, 53 Cal. 4th 1004,

3    1040 (2012).  However, "the employer is not obligated to police meal breaks and ensure no work

4    thereafter is performed."  *Id.*  If an employer does not provide meal and rest breaks in accordance

5    with state law, the employer must "pay the employee one additional hour of pay at the

6    employee's regular rate of compensation for each workday that the meal or rest or recovery

7    period is not provided."  Cal. Lab. Code § 226.7(c).

8         Defendant has policies in place to ensure employees take rest and meal breaks in

9    accordance with state law.  Miramontez Decl. ¶ 8; *see generally* Team Member Handbook; Policy

10   Manual.  Plaintiff does not argue the policies themselves violate state law.  *See* Opp'n at 15–16.

11   Rather, plaintiff argues she did not have work-free meal and rest breaks and says she was

12   frequently interrupted during her breaks.  *Id.* at 16; Vasquez Dep. 175:2–24, 177:12–18, 202:4–

13   204:8, 212:11–17, 227:2–16.  She also informed her manager of these interruptions.  Vasquez

14   Dep. 177:6–11.

15        The undisputed facts show defendant has policies in place to ensure employees receive

16   uninterrupted meal and rest breaks.  *See* Team Member Handbook at 8; Policy Manual at 5–6.

17   Additionally, the policies require interrupted breaks to be compensated.  *Id.*  As an ASM, plaintiff

18   herself trained new hires regarding the company's time keeping system and policies.  Plaintiff

19   Dep. 185:5–12.  She was aware of the written policy prohibiting employees from working "off

20   the clock."  *Id.* 185:9–15.  Moreover, plaintiff herself prepared the schedules for employees in her

21   store, including herself, and ensured everyone received sufficient lunch breaks.  *Id.* 135:22–

22   137:11; 206:13–17.  An employee who takes a late lunch break automatically receives a meal

23   break penalty.  *Id.* 167:15–168:5.

24        Although plaintiff testified she was frequently interrupted during her lunch breaks, *id.*

25   175:2–24, 202:7–204:8, her direct manager told her not to work during her lunch break and to not

26   answer phone calls during that time, *id.* 177:6–11, 181:25–183:3.  Plaintiff acknowledged she

27   could have directed employees who interrupted her to direct their questions to the supervisor on

28   duty because she was on her lunch break or she could have ignored their questions.  *Id.* 180:12–

181:4.  While she was on her lunch breaks, there was another manager or supervisor who was on the clock who could have answered those questions.  *Id.* 174:5–8.  Additionally, she chose not to clock in those interrupted times as times worked because she wanted to take the lunch break and did not want to clock back in.  *Id.* 173:9–174:4.  Moreover, plaintiff generally took an hour break for lunch, *id.* 202:4–6, and the interruptions often lasted two to ten minutes, *id.* 202:12–203:1, except for the one instance where the interruption lasted for 45 minutes and her manager later added 45 minutes to her timesheet as time worked, *id.* 204:1–21.  Even if she was interrupted for a full 30 minutes, plaintiff would have received a 30-minute uninterrupted lunch break in accordance with state law.  *See* Mot. at 25.

As for rest breaks, plaintiff testified there were "a lot of times [she] didn't even have time to take a break" and did not take a rest break every day because she was "[t]oo busy," there was "so much stuff to do," and she did not "have time to take a break." *Id.* 212:11–17, 227:2–16.  She acknowledged there were other supervisors she personally scheduled to be on the clock to ensure she would have the opportunity to take rest breaks.  *Id.* 212:18–21.  No one told her she could not take her rest break.  *Id.* 227:6–16.  And although she did not get her rest breaks, she made sure all her subordinate team members either received or had the opportunity to take their rest breaks.  *Id.* 254:20–255:8.

Here, the undisputed facts show O'Reilly gave plaintiff an opportunity to take uninterrupted meal and rest breaks, and had policies in place to enforce the break requirements. While plaintiff was on her breaks, there were other supervisors who could have answered questions and phone calls.  Her immediate supervisor told her not to work during her breaks. Finally, she had an opportunity to correct her timecards for any of the time she worked during her breaks and to be compensated for the interrupted meal and rest periods.  Plaintiff certified she had received all her meal and rest breaks, *id.* 217:25–221:11, and she received 219 meal break penalties for either late or missed meal periods, Miramontez Decl. ¶ 9.  At most, the undisputed evidence shows defendant did not police plaintiff to ensure she was not working during her breaks, which it was not required to do.

The court **grants** summary judgment as to this claim.

1

    **D.**    **Record Maintenance (Claim Four)**

2           Plaintiff argues defendant failed to maintain records in violation of California labor laws

3 because her time and pay records do not accurately reflect her time worked and compensation she

4 earned.  Opp'n at 17; Compl. ¶¶ 48–50.  Employees are required to keep "payroll records

5 showing the hours worked daily by and the wages paid to, and the number of piece-rate units

6 earned by and any applicable piece rate paid to, employees employed at the respective plants or

7 establishments."  Cal. Lab. Code § 1174(d).

8           Plaintiff argues because she was not provided duty-free meal and rest periods as required

9 by law, she should have been paid for the interrupted meal and rest periods.  Opp'n at 16–17.  As

10 noted, plaintiff herself testified she reviewed her timecard daily to ensure everything was correct

11 and reported any errors.  *Id.* 170:22–171:4; 199:22–24.  She signed her timecards at the end of the

12 pay period, knowing she had reviewed them daily.  *Id.* 171:1–10.  For example, after the incident

13 where her lunch break was interrupted for over 45 minutes, she informed her manager and her

14 manager added the 45 minutes to her time sheet as time worked.  *Id.* 204:17–21.  Plaintiff had an

15 opportunity to review and correct any errors in her record.  Here, no reasonable juror could find

16 defendant failed to maintain records.

17           The court **grants** summary judgment as to this claim.

18         **E.**    **Unfair and Unlawful Business Practice (Claim Five)**

19           Finally, plaintiff argues defendant's actions constitute and unfair and unlawful business

20 practice in violation of California Business and Professions Code section 127200.  Opp'n at 17–

21 18; Compl. ¶¶ 51–56.  Because this claim is derivative of her third and fourth claims, Opp'n at

22 17; Mot. at 27, this claim cannot survive, *see White v. Starbucks Corp.*, 497 F. Supp. 2d 1080,

23 1090 (N.D. Cal. 2007).

24           The court **grants** summary judgment as to this claim as well.

1   **V.    CONCLUSION**

2   For the foregoing reasons, the court **grants** defendant's motion for summary judgment **in**

3   **part.**  The court **denies summary judgment as to plaintiff's first claim.**  However, the court

4   **grants summary judgment as to plaintiff's second, third, fourth and fifth claims.**

5   In light of the expiration of the dispositive motion deadline, **a final pretrial conference is**

6   **set for October 4, at 10:00 a.m. in Courtroom 3 (KJM) before Chief District Judge**

7   **Kimberly J. Mueller.**  *See* E.D. Cal. L.R. 282.  The parties shall meet and confer and file a joint

8   pretrial statement no later than **three weeks prior** to the **final pretrial conference**.

9   The provisions of Local Rule 281 shall apply with respect to the matters to be included in

10   the joint pretrial statement.  At least one of the attorneys who will conduct the trial for each of the

11   parties shall attend the final pretrial conference.  All motions in limine must be filed in

12   conjunction with the joint pretrial statement.  In most cases, motions in limine are addressed and

13   resolved on the morning of the first day of trial.  The parties may alert the court at the final

14   pretrial conference and in their final joint pretrial statement that a particular motion or motions

15   should be resolved earlier.  At the final pretrial conference, the court will set a briefing and

16   hearing schedule on the motions in limine as necessary.  The parties are reminded that a motion in

17   limine is a pretrial procedural device designed to address the admissibility of evidence.  The court

18   looks with disfavor upon dispositional motions presented at the final pretrial conference or at trial

19   in the guise of motions in limine.

20   In the meantime, if the parties jointly agree to referral to a court-convened settlement

21   conference with another judge of the court, they may file such request in writing.

22   This order resolves ECF No. 27.

23   IT IS SO ORDERED.

24   DATED: August 29, 2024.

CHIEF UNITED STATES DISTRICT JUDGE

24